6 365
Case 2
111 695

## James R. McDowell *v.* John W. Couch.

Where the punishment of death has been commuted by the Governor and Senate to imprisonment for life, the owner of a slave thus sentenced cannot claim the slave upon the ground that the State cannot thus expropriate his property without an adequate compensation.

McDOWELL
v.
COUCH.

Where the time fixed for the execution of a capital sentence has passed, in consequence of an appeal to the Supreme Court, the time thus fixed upon not being a material part of the judgment, another time may be appointed; and it is the duty of the sheriff, without any new warrant or authority, to execute the sentence as soon as the affirmance of the judgment is officially announced to him.

The Governor and Senate have, by the Constitution, the power to pardon; and under this power may commute the punishment of death to imprisonment for life.

It is not essential that the owner of a slave whose sentence has been commuted from death to imprisonment for life, should give his consent to the change of punishment.

APPEAL from the District Court of Madison, *Richardson*, J.

*Isaac Johnson*, Attorney General for the State, contended: The important facts of this case are correctly stated in the brief of the plaintiff and appellant's counsel.

The points raised may be considered under the following heads: 1st. The period fixed for the execution of the slave *Jerry* having passed, pending an appeal to the Supreme Court, and no new day having been designated for the execution at the time of the commutation of the punishment, has the sentence become inoperative, and the commutation ineffectual?

The lawfulness of the original imprisonment of *Jerry* is not denied. He therefore can only be restored to the service of plaintiff by some act, omission or event which has since occurred. 'Sec. 2, art. 822 C. P. The fact that no new day had been fixed for the execution of the sentence, it is confidently affirmed, is not such an omission or event as would discharge the accused from the prosecution and the custody of the law. It is true, this court has said that it could not fix another day, when the day fixed for the execution of a sentence pronounced against a slave convicted before a tribunal organized under the act of 1846, had passed by, pending an appeal. *State* v. *Jerry*, 3d Ann. 577. The King's Bench, in England, as the centre of all subordinate jurisdictions, in capital matters, may fix another day for the execution of a criminal; and courts of general jurisdiction, such as the district courts in this State, may cause a felon to be brought to the bar again if he has not been executed pursuant to sentence, and fix a new day for his execution. Chitty's Cr. Law, 568. So, a special tribunal, having exclusive jurisdiction to try slaves capitally accused, may, as an incident to its powers, re-organize to fix another day for the execution of a sentence already pronounced, when the convict has not been executed pursuant to sentence. But in the case under consideration it is urged that one of the justices who composed the special tribunal died pending the appeal, and that the court consequently can never be re-organized. In reply to this objection it is deemed sufficient to say, that although the special tribunals in question must be composed of two justices and ten slave owners, in order to a complete organization; yet, that one justice and nine jurors of a court thus formed may constitute a quorum for the trial and sentence of a slave capitally accused and convicted. Sec. 15, act 1846, p. 115. Hence, it clearly results, when there has been a complete organization of this kind of court, as required by the first and fifth sections of this act, the trial may proceed and sentence be pronounced by one justice and nine jurors, and, as necessarily incidental to this power of the court, it may re-organize to fix another day for the execution of the sentence, when the convict has not been executed on the day first fixed; provided one justice and nine jurors of those who constituted the court as originally assembled, can be had.

A new day, therefore, for the execution of *Jerry* may be fixed under the sentence pronounced, unless the act of commutation sought by him and the inhabitants of the parish of Madison can be invoked to protect him. And this involves the question: Is the act of the Legislature authorizing the Governor and Senate to commute the punishment of crimes and offences unconstitutional, as averred by appellant's counsel? 546 Rob. Penal Law. Act 20th March, 1818. If it is declared to be unconstitutional, this court will direct a re-organization of the tribunal that tried *Jerry*, to fix another day for his execution. But the power to commute is not in derogation of the 47th article of the State Constitution. That article, in general terms, gives to the Governor and Senate, except in impeachments, the power of granting pardons; and our statute, in a wise and humane spirit, enables the same authority to abate something of the extreme rigor of a criminal sentence when no sufficient grounds for a pardon can be shown. The power to commute does not conflict with nor exclude the prerogative of pardon. Commutation is simply the change of punishment to which a person has been

McDowell
v.
Couch.

condemned, for a less rigorous one; and this change can only be granted by the executive authority, in which the pardoning power resides. Bouvier L. D. vol. 1, p. 288. It is sufficient, therefore, that the Legislature has delegated the power to commute crimes and offences to the Governor and Senate, to whom the Constitution has intrusted the pardoning power.

3d. It is further urged that *Jerry*, being a slave, could not assent to a change of the death penalty to perpetual imprisonment without the authorization of plaintiff, which was not accorded. This assumption has certainly no foundation in law or good morals to support it. It is quite enough that *Jerry* and the inhabitants of the parish of Madison petitioned for the commutation on grounds that induced the executive authority to grant it; and if the plaintiff, as former master, did not intercede, either from indifference, prudential motives, or from a desire to have the slave executed, it is perfectly immaterial; his voice could have had no legal potency in precipitating, averting or mitigating the sentence of the law. When a slave has forfeited his life to the law, it is *his* right to pray for a commutation of the punishment, and, if granted, to accept it without consulting the master, whose interest in the slave is resolved into a demand on the State treasury for his appraised value, if it should not exceed $300. When slaves commit crimes and are prosecuted in the name of the State, they are regarded as accountable beings, and not as things; and may be punished as the law directs, irrespective of the wishes of the master, who in such cases is only entitled to notice. C. C. 178.

Like a pardon, a commutation of punishment is the private, though official act of the executive authority, delivered to the individual for whose benefit it is intended. I shall not contend, that as a voluntary act of the governor, a pardon or commutation of punishment can be forced on a convict. The act of executive grace, however, will be considered as accepted until it is rejected by the person for whose benefit it was intended. 7 Peter's S. C. R. p. 160. But when a commutation from death to imprisonment is petitioned and prayed for by the sentenced convict and those who sympathize in his misfortunes, and when the consequence of granting such application is known and settled by law, the commutation, if granted, cannot be declined by either bond or free. To sanction a different rule would, it appears to me, encourage trifling with the executive authority as well as with the administration of justice.

*Thomas* and *Snyder*, for appellant, contended: This is a petitory action to recover the slave *Jerry*, in the possession of the defendant. He admitted the title of the plaintiff, but averred that he held the slave, as sheriff, under a warrant of arrest and order from the governor; annexed the order to his petition, and prayed the protection of the court.

That authority is a missive from the governor, dated the 15th of March, 1850, addressed to the defendant as sheriff of the parish of Madison, informing him that the slave *Jerry*, belonging to the plaintiff, had been convicted of the crime of murder, by a special tribunal composed of two justices of the peace and ten slave holders, and sentenced to be hung; and that for good and sufficient reasons the Senate had concurred with the Executive in commuting his punishment to imprisonment for life in the penitentiary; and "commanding him to take notice and govern himself accordingly."

The State intervened by her prosecuting attorney, claiming to be the true and lawful owner of the slave, and as such "entitled to his services for and during the then term of his natural life; setting out as the ground of the right, his conviction, sentence, and commutation of punishment to imprisonment in the penitentiary for life; and to this intervention the plaintiff pleaded a general denial.

The case was tried upon the pleadings and a statement of facts, in substance: 1. That the slave *Jerry*, the property of the plaintiff, was convicted in January, 1849, of the crime of murder, by a legally constituted tribunal for the trial of slaves, and sentenced to be hung in the month of February of that year. 2. That upon appeal to the Supreme Court his sentence was affirmed, and that at the time of the affirmation the day fixed by the special court for his execution had passed. 3. That subsequently to the day fixed for his execution, and the affirmation of his sentence by the Supreme Court, to wit, in the month of October, 1849, the citizens of the parish of Madison, and *Jerry*, petitioned for the commutation of his punishment. 4. That his punishment was commuted, the Senate concurring with the Executive, to imprisonment for life in the penitentiary; and the defendant notified thereof by a missive from the governor, dated the 13th of March, 1850, "commanding him to govern himself accordingly."

5. That the defendant, as sheriff, holds him by virtue of the arrest for the crime of murder, of which he was convicted, and by virtue of said notification or order from the governor; and not under any claim of title as owner. 6. That no mandate was ever issued by the special court for his execution, and no day fixed by the Supreme Court. 7. That the special court was composed of two justices of the peace and ten slave holders, one of which justices died pending the appeal in the Supreme Court. 8. The defendant was cognizant of the decision of the two courts, special and supreme.

I. The title of the plaintiff, so far from being questioned, is expressly admitted both by the defendant and the State. II. The State could alone acquire property in him, under the Constitution, without the assent of the plaintiff, by the previous payment of an adequate consideration. Art 109. III. Has the State, under the circumstances, a right to detain him upon the criminal charge?

1. The period fixed for his execution having passed, the sentence became inoperative. 2. If it be competent for a court of general criminal jurisdiction to fix another day of execution after the first had transpired without the sentence of the law being executed, it could not have been done in this case; the trying tribunal being an ephemeral one, which ceased to exist with its adjournment, and which could never be re-organized, one of its members having died pending the appeal. 3. The warrant of arrest authorized the defendant to arrest and detain him for the purpose of his trial; but that passed, he could only detain him under an order of commitment or warrant of execution. Neither was made or granted; and from that time his detention was in violation of the plaintiff's right of property and the free and uncontrolled use of it. 4. The State claims to be his owner, and as such entitled to his services for life as a convict prisoner in the penitentiary; and bases that claim upon the fact of his conviction and the commutation of his sentence.

1. At the time of the commutation there existed no sentence against him, which, by legal possibility, could be executed. Instead, therefore, of softening, by modifying an existing sentence of greater severity, the commutation of punishment, under which the State claims to detain him as property and as an offender, is in fact the only, if there really is any, sentence of condemnation and warrant for his detention.

2. Has the Executive and Senate the power by the Constitution and laws of the State, under the semblance of commuting the punishment of a convict, to revive an inoperative or defective sentence, and make their act the warrant for inflicting the substituted punishment? 3. We have found nothing in the Constitution or laws to warrant the commutation of the sentence of a convict without his free and full assent; and a slave is incapable of giving such assent without the authority of his master, which was not accorded in this instance.

4. When a sentence of death is commuted to imprisonment for life, the imprisonment if authorized, is so not by the sentence, but by the express or implied compact resulting from the supposed grace of the State, and the acceptance of it by the culprit; and if accepted in error, the culprit, supposing he is liable to be punished capitally when he is not legally punishable at all, can it be doubted but that upon the fact being shown he would be entitled to his discharge.

There is no legal difference between a commutation of punishment and a pardon. They both have the effect of setting aside the judgment of the court pronouncing the judgment. And a pardon or commutation is not complete until it is accepted by the convict. And a pardon cannot be forced upon a culprit; and for a much stronger reason, a commutation cannot. *United States* v. *Wilson*, 7 Peters, 150.

There is no power delegated by the Constitution to the Governor and Senate to commute the punishment of a convict. The act of the Legislature authorizing commutations is unconstitutional; the 49th section of the Constitution gives to the governor the power to reprieve, and to him and the Senate the power of pardoning. A pardon and commutation cannot be construed to mean one and the same thing.

In the case of *The State* v. *Jerry*, upon his and his master's application for a writ of *habeas corpus*, and the refusal of the judge to discharge him, the facts are the same as in this case. His right to be discharged under the facts is based on art. 822, sec. 2, of the Code of Practice.

The judgment of the court was pronounced by

PRESTON, J. The plaintiff brings this suit against the sheriff of the parish of Madison, to recover a slave named *Jerry*. The State, by the district attorney, intervened. He alleges the following facts, which have been admitted or proved. That the slave *Jerry* was prosecuted and convicted of the crime of murder, before a tribunal composed of two justices of the peace and ten slave-holders of the parish of Madison, convened and organized in pursuance of the act of 1846, relative to the trial of slaves. He was sentenced to be executed on the — day of February, 1849. An appeal was taken on his behalf to the Supreme Court, which, in March, 1849, affirmed the judgment of the special tribunal. At the session of the Legislature in 1850, a petition on behalf of the slave, in which he, and many of the inhabitants of the parish of Madison united, was presented to the Governor and Senate of the State, for the commutation of his punishment.

It was commuted by the Executive and Senate to imprisonment for life in the penitentiary; of which commutation the sheriff was notified, and he was directed by the governor's warrant, dated the 13th of March, 1850, to govern himself accordingly.

The court by its judgment rejected the claim of the plaintiff, and directed the sheriff to deliver the slave to the keeper of the penitentiary at Baton Rouge; from which judgment the plaintiff, the owner of the slave, has appealed.

Various grounds are urged for the reversal of the judgment. 1st. It is contended, that the slave being admitted to have been the property of the plaintiff, the State cannot, under the 107th article of the Constitution, acquire a property in him without the previous payment to the plaintiff of an adequate compensation. The property in a slave is such that from its nature the owner may lose it by the crimes and offences of the slave; for slaves, as well as free persons, forfeit their lives or subject themselves to imprisonment for life by their crimes. Even for damages caused by a slave to individuals, the owner must pay or abandon the slave in satisfaction of them. And for such necessary results of the criminal acts of slaves the owners are not of right entitled to indemnification; and yet the State generously accords to the master of a slave sentenced to death or imprisonment for life, an indemnification of $300, being the full value of any slave convicted of a capital crime.

It is next urged, that the State has no right to detain the slave on a criminal charge, because the period fixed for his execution having passed without the sentence being carried into effect, it became inoperative. The suffering of death was essentially the punishment to which the slave was sentenced; and fixing the day of execution was an incident, but not an essential part of the judgment. It is said by Blackstone, in his Commentaries, "that the time and place of execution are by law no part of the judgment." Vol. 4, p. 404. In the case of *The King* v. *Rogers et al.*, the defendants had been convicted of highway robbery, and sentenced to death. Being detained in prison awaiting their execution, they murdered the jailer, broke the jail and escaped, but were some time afterwards again arrested and imprisoned. They were brought before the Court of King's Bench by a writ of *habeas corpus*; but instead of being discharged, the return showing their former conviction and sentence, the court directed an issue, to ascertain the identity of some of them, which was denied; and that being found, ordered them to be executed in pursuance of the former sentence. 3 Bur. Rep. 1810. And in the case of *Earl Ferrers*, found guilty of murder by the House of Peers, the House subsequently propounded the following question

McDowELL
*v.*
Couch.

to the judges: "Supposing a peer, so indicted and convicted, ought by law to receive such judgment as aforesaid, and the day appointed by the judgment for execution should lapse before such execution done, whether a new time may by appointed for the execution, and by whom?" To which the judges answered in writing: "Supposing the day appointed by the judgment for execution should lapse before such execution done, (which however the law will not presume,) we are all of opinion, that a new time may be appointed for the execution, either by the High Court of Parliament, before which such peer shall have been attainted, or by the Court of King's Bench, the Parliament not sitting; the record of the attainder being properly removed into that court."

There is no doubt, therefore, that the convicted slave was subject to execution, notwithstanding the day of execution appointed by the tribunal had passed.

It is urged that another day could not be fixed for the execution of the slave in this case, because the special tribunal which tried him, being an ephemeral one, ceased to exist with its adjournment and could never be re-organized, one of its members having died during the pendency of the appeal.

The act of 1846, creating the tribunal, did not direct it in sentencing the slave to death to fix a particular day for the execution. Although this was prudent and conformable to usage, we have seen that it was not an essential part of the sentence; and, as the appeal rendered the execution legally impossible on that day, it was the duty of the sheriff, without any new authority or warrant, to have executed the sentence as soon as the judgment was affirmed by the Supreme Court, and the affirmance thereof was officially communicated to him by the justice of the peace in whose office the original proceedings and judgment had been filed, or by his successor in office, if dead. And if the sheriff had failed to do so, the executive of the State, bound by the Constitution to see the laws faithfully executed, would no doubt have caused the legal execution of the convict.

It is next contended, that the Governor and Senate had no power to commute the capital punishment of the slave to imprisonment for life. The Constitution gives the governor power, with the advice and consent of the Senate, to grant pardons. The term being derived from the Common Law of England, must have the same import in our Constitution and laws which belongs to it in England. It has been held from time immemorial in England, that "the king may extend his mercy upon what terms he pleases, and may annex to his bounty a condition either precedent or subsequent, on the performance whereof the validity of the pardon will depend: and this by the Common Law, which prerogative is daily exerted in the pardon of felons, on condition of being confined to hard labor for a stated time, or of transportation to some foreign country for life or for a term of years." 4 Black. Com. 401.

The power has always been construed in the same manner in this State. Besides, an act of the Legislature, approved the 5th of March, 1823, expressly gives power to the Governor and Senate to commute the punishment of death into a lesser punishment in favor of slaves "whenever the circumstances of the case are such as to entitle the offender to such commutation." B. & C. 67.

This clause of the statute, being connected by the copulative conjunction with the preceding clause requiring the recommendation of the commutation by the jury which tried the convict, creates some doubt; but we think the Legislature, by the comprehensive terms used, intended to confer the power even for causes and circumstances which might occur after the jury were discharged and the tribunal dissolved.

The last point made by the counsel of the plaintiffs, which we deem it essential to notice, is thus expressed by them : " We have found nothing in the Constitution or laws to warrant the commutation of the sentence of a convict without his free and full assent; and a slave is incapable of giving such assent without the authority of his master, which was not accorded in this instance."

The answer of the attorney general on this point is so appropriate and well expressed that we will only quote and adopt it as our opinion on this part of the case : "This assumption has certainly no foundation in law or good morals to support it. It is quite enough that *Jerry* and the inhabitants of the parish of Madison petitioned for the commutation on grounds that induced the executive authority to grant it; and if the plaintiff, as former master, did not inercede, either from indifference, prudential motives, or from a desire to have the slave executed, it is perfectly immaterial; his voice could have had no legal potency in precipitating, averting or mitigating the sentence of the law. When a slave has forfeited his life to the law, it is his right to pray for a commutation of the punishment; and, if granted, to accept it without consulting the master, whose interest in the slave is resolved into a demand on the State treasury for his appraised value, if it should not exceed $300. When slaves commit crimes and are prosecuted in the name of the State, they are regarded as accountable beings, and not as things; and may be punished as the law directs, irrespective of the wishes of the master, who in such cases is only entitled to notice. C. C. 178.

The judgment of the district court is therefore affirmed, with costs.